


243-07/PJG
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Barbara G. Carnevale (BG 1651)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

METAL UND ROHSTOFF SHIPPING BV,

Plaintiff,

-against -

ACE MARITIME INC.,

Defendant.

-----------------------------------------------------------------x

**07 CV ____________ (____)**

**VERIFIED COMPLAINT**

Plaintiff METAL UND ROHSTOFF SHIPPING ("MUR") BV, by its attorneys Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant ACE MARITIME INC. ("ACE"), alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract. The case also falls within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2. At all times material hereto, Plaintiff MUR was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Atrium Building, Strawinskylaan, 3011, NL 10077 ZX, Amsterdam, The Netherlands.

3. At all times material hereto, Defendant ACE was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Seoul, Korea.

4. On or about September 24, 2004, Plaintiff MUR, as charterer, and ACE, as owner, entered into a maritime contract of charter party for the time charter of the vessel M/V GREAT MOTION (hereinafter the "Charter Party").

5. Disputes arose between the parties which were submitted to London Arbitration.

6. Following the submissions of the parties to the arbitration, the tribunal rendered two Awards in favor of MUR, true and accurate copies of which are annexed hereto as Exhibits A and B.

7. The Awards in favor of MUR and against ACE, and the claims on which MUR seeks enforcement and/or security are as follows:

i. Principal sum due under the first Award **USD $69,222.13;**

ii. Interest on principal sum at the rate of 6% per annum as specified in the Award compounded quarterly from the date specified in the Award, February 23, 2005 through May 23, 2007 (end of the current "monthly rest"), which totals **USD $8,887.43**;

iii. Costs of the Award and the arbitrator in the total sum of £1,790 plus interest at the rate of 6.75% per annum as specified in the Award compounded quarterly from

October 13, 2006 through July 13, 2007 (end of the current "monthly rest"), which totals **USD $3,755.10** at the prevailing rate of exchange;

iv. MUR's costs in the total sum of £1,500 plus interest at the date of 7% per annum compounded as specified in the Award of Costs compounded quarterly from November 24, 2006 through May 24, 2007 (end of the current "monthly rest"), which totals **USD $3,098.31** at the prevailing rate of exchange; and

v. Costs of collection, including costs already expended, as well as anticipated costs, al of which are properly recoverable as a matter of English law, the law applicable to the contract, in the total sum of **$23,600;**

8. Despite due demand, ACE has not paid the amounts due and outstanding under the Awards, and the entire amount remains due and outstanding to MUR.

9. Plaintiff MUR has fulfilled all obligations required of it.

10. This action is brought to obtain jurisdiction over Defendant ACE, to confirm and enforce the existing Awards and to obtain security for execution on the judgment to be entered on the existing award and for the recoverable costs incurred in this effort as outlined above.

11. Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name, at, moving through,

or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

12. The total amount sought to be attached, as specified above in paragraph 7, together with an allowance for additional interest on items specified in paragraph 7(i) – (iv) during the period this enforcement action is pending (calculated to be $8,921.11 for a period of 1.5 years), is **$116,884.09**

WHEREFORE, Plaintiff MUR prays:

a. That process in due form of law according to the practice of this Court issue against Defendant ACE, citing it to appear and answer the foregoing, failing which a default will be taken against it for the amounts of the claim due under the Awards and as set forth above, plus interest, costs and attorney fees.

b. That if Defendant ACE cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant ACE, up to and including the claim of **USD $116,884.09** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant ACE (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its name or as may be held, received or transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein served;

c. That this Court determine and adjudge Plaintiff entitled to enforce the Awards and enter judgment in Plaintiff's favor thereon and against Defendant in the amount of the Awards, plus interest, costs, and additional sums properly recoverable and otherwise recognize, confirm and enter judgment on the subject Awards and allow execution thereon; and

d. That Plaintiff MUR have such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
May 3, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
METAL UND ROHSTOFF SHIPPING BV

By: ______________________

Peter J. Gutowski (PG 2200)
Pamela L. Schultz (PS 0335)
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

**ATTORNEY VERIFICATION**

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1. I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and its solicitors.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

PETER J. GUTOWSKI

Sworn to before me this
3rd day of May, 2007.

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified In Queens County
Certified In New York County
Commission Expires Dec. 31, 2010

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**BETWEEN**

**METAL UND ROHSTOFF SHIPPING BV, AMSTERDAM** Claimants (Charterers)

and

**ACE MARITIME INC, SEOUL** Respondents (Disponent Owners)

**"GREAT MOTION"**

Charterparty dated 24th September 2004

**AWARD**

**WHEREAS:**

(A) By the terms of a charterparty dated 24th September 2004 on an amended NYPE form, the Claimant Charterers ("the Charterers") chartered the m.v. "Great Motion" from the Respondent Disponent Owners ("the Disponent Owners") for a time charter on terms and conditions set out therein.

(B) Clause 17 of the charterparty provided that any dispute arising should be referred to arbitration in London in a manner more particularly set out therein.

(C) Disputes did arise, for the determination of which the Charterers appointed the undersigned Clive Aston of 30 Hobbs Court, 2 Jacob Street, London SE1 2BG as arbitrator. Notice of such appointment was given by



the Charterers' lawyers to the Disponent Owners by e-mail dated 23rd June 2005, with a request that the Charterers appoint their own arbitrator within 14 days. In the absence of any response from the Disponent Owners, the Charterers' lawyers sent a further message to the Disponent Owners by an e-mail dated 27th July 2005 advising them that if they did not appoint their arbitrator within seven days, the undersigned Clive Aston would be appointed as sole arbitrator in terms of Section 17 of the Arbitration Act 1996. No response to this message was received and, at the request of the Charterers, I accepted the appointment as sole arbitrator in this reference on 5th August 2005, being satisfied that proper notices and opportunity had been given to the Disponent Owners to appoint their own arbitrator and that I was entitled so to act. I accepted the appointment on LMAA Terms (2002), the seat of the arbitration being in England.

(D) The dispute referred to me concerned a claim by the Charterers, originally for a total of US$87,127.85, but later amended, after receipt of the Charterers Defence Submissions, to US$74,276.75. Of this sum, the Disponent Owners admitted an amount of US$39,402.17 to be due to the Charterers.

(E) I received written submissions accompanied by supporting documents from South African lawyers acting on behalf of the Charterers and from the Disponent Owners themselves.

(F) The difference between the parties was made up of the following items:

(i) <u>Speed claim (US$16,400)</u>:

The vessel was described in the charterparty as being capable of steaming throughout the entire period of the charterparty at a speed of about 14 knots in ballast and about 13.5 knots laden. According to a Voyage Report prepared by Aerospace and Marine International Corporation, the vessel only maintained an average speed of 9.32 knots for the laden voyage from Singapore to Nantong. Adjusting this speed to take account of weather and current factors, Aerospace and Marine International Corporation

calculated that the vessel had achieved a performance speed of 12.66 knots and lost a total of 19.7 hours on the voyage. At a daily hire rate of US$20,000 this equated to US$16,400, the amount claimed by the Charterers. The Disponent Owners offered only the shortest of responses to the claim, stating merely that on the voyage the vessel had experienced strong winds and adverse currents which had accounted for the slow speed maintained. The Charterers' response to this was that such factors were taken in the account in the report of Aerospace and Marine International Corporation.

No provision was made in the charterparty for the reports of any weather routing agency to be binding upon the parties. In such cases it is usual, therefore, to take account of the information contained in the vessels' logs when assessing its performance. Here, though, the logs were not available. All that the Disponent Owners relied upon was a copy of messages sent by the Master on a daily basis to the Charterers during the course of the voyage. These admittedly did show that the vessel had experienced adverse weather conditions. To be fair, though, to Aerospace and Marine International Corporation, their report also reflected mostly adverse conditions on the voyage. However, on one day in particular, 18th January 2005, they recorded conditions of Beaufort Force 2/3 with light seas. Although the daily report sent by the Master to the Charterers on that day referred to conditions of Beaufort Force 5 and a swell of two metres, another message sent by the Master to Aerospace and Marine International Corporation described the wind conditions as "Light Air" with a swell of one metre only at precisely the same position and time as reported to the Charterers. This was a troubling discrepancy and suggested that the information reported to the Charterers overstated the conditions experienced by the vessel. Although this discrepancy occurred on one day only, that

happened to be the one day of good weather conditions apparently experienced by the vessel. This was enough to raise doubts as to the accuracy of the vessel's records. For this reason I accepted the report of Aerospace and Marine International Corporation as providing the better evidence of the conditions experienced and the vessel's performance on this voyage. I therefore accepted the Charterers' claim under this heading.

(ii) <u>Delay at Singapore due to engine problems (US11,250):</u>

This claim arose from the vessel's late arrival at Singapore on 10th January 2005. According to a report sent at the time by the Master, the vessel was delayed in arriving at Singapore between 23.00 hours local time on 9th January and 12.30 hours local time 10th January *"due to main engine trouble"*. The Charterers therefore claimed 13 hours 30 minutes offhire, equating to US$11,250. Although the Disponent Owners did not include this offhire in their Hire Statement, they offered no defence to it. The claim therefore appeared well founded and succeeded.

(iii) <u>Delay at Singapore anchorage (US$4,930.56):</u>

On arrival at Singapore the vessel apparently anchored in the wrong position. As a result, the Port Authority ordered it to shift to the correct position just as bunkering operations were about to commence. As a result those operations were interrupted between 18.30 hours and 21.15 hours on 10th January 2005. The Charterers sought to deduct hire for the period from 15.20 hours, when the vessel first anchored, until 21.15 hours when it anchored at the correct position. This, however, took no account of the fact that the vessel was required anyway to wait until 17.35 hours for the bunker barge to arrive alongside. Time was only lost, therefore, from then until 21.15 hours. As a result, the vessel was only offhire

for 3 hours 40 minutes, equating to hire of US$3,055.55 and the Charterers' claim only succeeded to that extent.

(iv) Bunkers during offhire (US$2,971.60):

The Charterers claimed pro-rated consumption of IFO for the time lost by under-performance on the voyage from Singapore to Nantong and for MDO consumed whilst offhire in port at Singapore, based upon the consumption figures in the charterparty. They offered no evidence, of any actual additional consumption of IFO during the voyage as a result of the vessel's slow steaming and no reference was made to this in the report of Aerospace and Marine International Corporation. I found this surprising, as some reference to the vessel's bunker consumption is usually found in such reports. It is possible that the vessel actually consumed less bunkers than warranted because of its slow steaming. There was no evidence either way. The burden of establishing their claim under this heading rested with the Charterers and, at least in respect of IFO consumption, I found that they failed to prove their claim. Their small claim for US$171.60 for MDO consumed whilst offhire in port, though, was well founded and succeeded.

(v) Owners' expenses (US$500):

Provision was made in the Charterers' hire statement for a payment of cash to Master of US$500. This was not acknowledged in the Disponent Owners' statement. Without proof of such payment by the Charterers, this sum was therefore properly excluded from the final balance due to the Charterers.

(G) As a result of the above, I found that a balance of US69,222.23 is due by the Disponent Owners to the Charterers, in accordance with the Hire Statement attached as Appendix 1.

(H) Neither party requested an oral hearing or that I issue a Reasoned Award.

**NOW I**, the said Clive Aston, having taken upon myself the burden of this reference and having carefully and conscientiously considered the submissions and documents placed before me by both parties and given due weight thereto, **DO HEREBY MAKE ISSUE AND PUBLISH** this my **AWARD** as follows:

1. **I FIND AND HOLD** that the Charterers' claim for US$74,276.75 succeeds in the sum of US$69,222.13 and no more.

2. **I THEREFORE AWARD AND ADJUDGE** that the Disponent Owners should pay to the Charterers the sum of US$69,222.13 (United States Dollars Sixty Nine Thousand Two Hundred and Twenty Two Dollars and Thirteen Cents) together with interest thereon at the rate of 6% per annum, compounded at three monthly rests with effect from 23rd February 2005 until the date of payment of such sum by the Disponent Owners to the Charterers.

3. **I FURTHER AWARD AND ADJUDGE** that the Disponent Owners should bear and pay their own costs and the costs of the Charterers in this reference (and I reserve to myself the jurisdiction to assess and make an Award of costs if they cannot be agreed between the parties) together with the cost of this my **AWARD** which I tax and settle in the sum of £1,790, **PROVIDED ALWAYS** that, if, in the first instance, the Charterers shall have paid any part of the cost of this Award, they shall be entitled to an immediate refund from the Disponent Owners of the sum so paid, together with interest thereon at the rate of 6.75% per annum, compounded at three monthly rests with effect from the date of such payment by the Charterers until the date of reimbursement of such sum by the Disponent Owners to the Charterers.

Given under my hand this 10th day of October 2006.

Clive Aston

Witness

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN

METAL UND ROHSTOFF SHIPPING BV, AMSTERDAM — Claimants (Charterers)

and

ACE MARITIME INC, SEOUL — Respondents (Disponent Owners)

"GREAT MOTION"

Charterparty dated 24th September 2004

AWARD OF COSTS

WHEREAS:

(A) By the terms of a charterparty dated 24th September 2004 on an amended NYPE form, the Claimant Charterers ("the Charterers") chartered the m.v. "Great Motion" from the Respondent Disponent Owners ("the Disponent Owners") for a time charter on terms and conditions set out therein.

(B) Clause 17 of the charterparty provided that any dispute arising should be referred to arbitration in London in a manner more particularly set out therein.

(C) Disputes did arise, for the determination of which the Charterers appointed the undersigned Clive Aston of 30 Hobbs Court, 2 Jacob Street, London SE1 2BG as arbitrator. Notice of such appointment was given by the Charterers' lawyers to the Disponent Owners by e-



mail dated 23rd June 2005, with a request that the Charterers appoint their own arbitrator within 14 days. In the absence of any response from the Disponent Owners, the Charterers' lawyers sent a further message to the Disponent Owners by an e-mail dated 27th July 2005 advising them that if they did not appoint their arbitrator within seven days, the undersigned Clive Aston would be appointed as sole arbitrator in terms of Section 17 of the Arbitration Act 1996. No response to this message was received and, at the request of the Charterers, I accepted the appointment as sole arbitrator in this reference on 5th August 2005, being satisfied that proper notices and opportunity had been given to the Disponent Owners to appoint their own arbitrator and that I was entitled so to act. I accepted the appointment on LMAA Terms (2002), the seat of the arbitration being in England.

(D) The dispute referred to me concerned a claim by the Charterers, originally for a total of US$87,127.85, but later amended, after receipt of the Charterers Defence Submissions, to US$74,276.75. Of this sum, the Disponent Owners admitted an amount of US$39,402.17 to be due to the Charterers.

(E) On 10th October 2006 I issued an Award by which I awarded the Charterers the sum of US$69,222.13 plus interest and costs.

(F) On 31st October 2006 the Charterers advised that they had been unable to agree their recoverable costs with the Disponent Owners. They claimed the sum of £1,500 and requested and Award of Costs in that amount. By an e-mail dated 1st November 2006 I requested the Disponent Owners to let me have any of their objections to the sum claimed by no later than 14th November 2006, failing which I advised them that I would proceed directly to consider the request for an Award of Costs. I stated that I did not intend to allow any slippage beyond that date so they should make sure that I received their comments on time. No response was received and on 17th November 2006 the Charterers' South African lawyers requested that I proceed to an Award of Costs.

(G) The arbitration reference had involved several rounds of submissions and I was in no doubt whatsoever that

the Charterers' costs were very reasonably stated at £1,500. In the circumstances I have no hesitation in awarding them the sum claimed.

(H) Neither party requested an oral hearing or that I issue a Reasoned Award.

**NOW I**, the said Clive Aston, having taken upon myself the burden of this reference and having carefully and conscientiously considered the submissions and documents placed before me by both parties and given due weight thereto, **DO HEREBY MAKE ISSUE AND PUBLISH** this my **AWARD OF COSTS** as follows:

1. **I FIND AND HOLD** that the Charterers' claim for costs of £1,500 succeeds in full.

2. **I THEREFORE AWARD AND ADJUDGE** that the Disponent Owners shall pay to the Charterers the sum of £1,500 (Pounds Sterling One Thousand Five Hundred Pounds Only) together with interest thereon at the rate of 7% per annum, compounded at three monthly rests with effect from the date of this Award of Costs until the date of payment of such sum by the Disponent Owners to the Charterers.

3. **I FURTHER AWARD AND ADJUDGE** that the Disponent Owners shall bear and pay the costs of this my **AWARD** which I tax and settle in the sum of £275, **PROVIDED ALWAYS** that, if, in the first instance, the Charterers shall have paid any part of the cost of this Award, they shall be entitled to an immediate refund from the Disponent Owners of the sum so paid, together with interest thereon at the rate of 7% per annum, compounded at three monthly rests with effect from the date of payment by the Charterers until the date of reimbursement of such sum by the Disponent Owners to the Charterers.

Given under my hand this 20th day of November 2006.

Clive Aston

Witness